UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

EDWARD FURA,

    Plaintiff,

v.

Case No. 10-13298

Hon. John Corbett O'Meara

FEDERAL EXPRESS CORPORATION
LONG TERM DISABILITY PLAN, *et al.,*

    Defendants.
_____/

**FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER
GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Before the court are cross-motions for summary judgment on the administrative record, both filed May 2, 2011. The motions have been fully briefed. The court heard oral argument on August 11, 2011, and took the matter under advisement.

**FINDINGS OF FACT**

1. Plaintiff Edward Fura filed his complaint on August 20, 2010, to recover long-term disability benefits under the Employee Retirement Income Security Act ("ERISA").

2. Plaintiff seeks benefits from the Federal Express Long Term Disability Plan ("Plan").

3. Plaintiff began working for Federal Express in 1986 and is a Covered Employee under the Plan.

4. Since 2005, Plaintiff has undergone three major surgeries on his back.

5. He underwent surgery on November 7, 2005, to remove a tumor from his spinal cord. Subsequently, he returned to work

6. He continued to experience back problems and underwent a second back surgery on

January 25, 2007.

7. Plaintiff received short-term disability benefits from the Federal Express Corporation Short Term Disability Plan from February 8, 2007, to August 8, 2007.

8. Plaintiff then received long-term disability benefits under the Plan for an Occupational Disability from August 9, 2007, to August 8, 2009.

9. On February 14, 2008, the Social Security Administration determined that Fura is disabled and awarded him Social Security Disability Insurance benefits with an onset date of January 25, 2007, the date of Fura's second back surgery.

10. On January 21, 2009, Fura underwent a third back surgery after a diagnosis of "post-laminectomy syndrome with spinal stenosis, scoliosis, T12 to SI." AR 00034-35.

11. On February 9, 2009, Defendants began investigating whether Fura was entitled to continue to receive long-term disability benefits. In order to qualify for such benefits beyond a period of two years, a claimant must be "totally disabled" as defined by the Plan – a "complete inability . . . to engage in any compensable employment for twenty-five hours per week." AR 00553.

12. Under the Plan, such disability must be "substantiated by significant objective findings which are defined as signs which are noted on a test or medical exam and which are considered significant anatomical, physiological or psychological abnormalities which can be observed apart from the individual's symptoms." AR 00545-46, LTD Plan at § 1.1

13. Three months after his third back surgery, Fura saw his surgeon, Dr. Richard Easton. Dr. Easton reported as follows:

> Since the last visit the quality of life is the same. The location of
> the pain is in the lumbar region. The quality is achy, burning,

> knifelike, numbing, shooting, throbbing. The pain radiates into both legs, both heels, and toes bilaterally. Associated symptoms include weakness, numbness, stiffness. The symptoms are worse with sitting, standing, walking, with sleeping. The patient has tried physical therapy. There was no improvement noted with the therapies tried. AR 00036 (4/20/09 visit).

14. Upon physical examination, Dr. Easton reported that Fura had "full, painless range of motion of the thoracic and lumbar spine. Normal stability. Normal strength and tone. SPINAL SPASMS." AR 00037. His diagnoses included lumbar/lumbosacral degeneration, lumbar/lumbosacral stenosis, lumbar/thoracic radiculopathy, sciatica, lumbosacral spondylosis, and foot drop. Id.

15. Dr. Easton recommended "home physical therapy, pain management program, physical therapy, physical medicine rehabilitation." Id. "Activity restrictions include no bending, carrying, driving, lifting greater more [sic] 10 pounds, pulling, pushing, reaching, sitting, standing, twisting motions. It is recommended that the restrictions are maintained for 6 months. The patient is permanently disabled." Id.

16. In April 2009, Aetna requested opinions from Fura's treating physicians regarding the extent of his disability. Aetna requested that Drs. Easton and Kalkanis complete a form indicating whether Fura "can work at any compensable employment for minimum of twenty-five hours a week (i.e. sedentary job for 25 hrs per week)." AR 00236-37. Both doctors checked "no," indicating that Fura "is unable to work at any compensable employment for a minimum of twenty-five hours per week." Id.

17. Aetna requested a paper review of Fura's file from Dr. James Wallquist, an orthopedic surgeon, and Dr. Gerald Goldberg, a neurologist. On June 8, 2009, Dr. Wallquist completed his review, concluding that

> [T]here were insufficient updated quantitative physical
> examination findings and/or diagnostics to preclude this claimant
> from performing work in any sedentary occupation for a minimum
> of 25 hours per week. The claimant was deemed capable of lifting
> ten pounds with a restriction on bending, carry, and driving, as
> well as pushing, pulling, reaching, sitting, standing, and twisting
> motions. The sitting, standing activities were not quantified. The
> claimant would be required to have a change position option as
> needed and engage in limited standing and walking.

AR 00297.

18.     Dr. Goldberg concluded that

> [T]here is no evidence that the claimant has a functional
> impairment that would preclude him from engaging in any
> compensable employment for a minimum of 25 hours a week. He
> does have weakness of his L5 muscles on the right. He has
> diabetic neuropathy and some residual back pain but the most
> recent information does not indicate that it is other the degree and
> severity that would preclude the claimant from being able to work
> at 25 hours per week. His restrictions would be those that would
> be related to a sedentary position and he would not be expected to
> do any significant bending, lifting, twisting, or extensive walking.

AR 00301 (6/16/09).

19.     Dr. Kalkanis examined Fura on June 9, 2009. He noted that "the patient still has considerable pain in his back and down his legs and he is suffering from significant edema and cellulitis in his legs, a condition for which he now sees Dr. Justin Riutta and is undergoing wrapping therapy to provide continuous compression to his calves in an effort to control his edema. He needs a walker for ambulation." AR 00056. Dr. Kalkanis also noted that "on individual muscle strength testing, he has full 5/5 motor power when he is not bearing weight. Sensation is intact to light touch sense throughout. He has 2+ bilaterally and symmetric deep tendon reflexes and his incision has well healed. I feel that he continues to qualify for the status of complete disability at this time. He is planning on restarting physical therapy next month and

hopefully, this will allow him to achieve a greater level of functionality." Id.

20.     On June 30, 2009, Aetna sent Fura a letter advising him that his claim for long-term disability benefits beyond August 8, 2009, was denied because there was "no clinical data that substantiates a physical impairment which would preclude you from engaging in any compensable occupation for a minimum of 25 hours a week." AR00039-40.

21.     On July 21, 2009, Dr. Riutta provided a letter on Fura's behalf, stating:

> Mr. Fura is a patient of mine who has a known history of significant bilateral lower extremity lymphedema.  The lymphedema limits mobility and results in recurrent infections of the lower extremity.  His current treatment regimen requires him to be wrapped 23-hours per day.  His lymphedema is the primary disabling factor in his current physical capacities.  Based on my most recent clinical assessment on June 9, 2009, he has pronounced lymphedema that requires 24-hour care.  Any restriction in his care or work-related activity would compromise his status of his lymphedema and will result in recurrent infections and likely repeat hospitalizations.  Therefore, I do not identify that Mr. Fura is at a current position in which he can perform any work-related duties.

AR 00055.

22.     On August 13, 2009, Dr. Jodi Ganley, Fura's neurologist, wrote a letter on behalf of Fura to Aetna "to appeal the disability rejection." AR00044.  Dr. Ganley reported that Fura had a "loss of sensation in lower extremities."

> The patient was only able to ambulate when he was wearing braces, to support his feet and ankles and with the use of a cane. . . . He has continued to have weakness in his lower extremities.  His balance remains poor.  He experiences swelling of his lower extremities, especially feet and ankles, because of lack of mobility at those joints. . . . Dr. Boodin [neurosurgeon] felt that Mr. Fura had significant demyelinating sensory motor neuropathy of the bilateral lower extremities, as well as a residual bilateral L5 radiculopathy.  Both of these conditions combined are the reason that the patient has a lack of sensation of the lower extremities and

> marked weakness in the lower extremities. . . . Mr. Fura continues to be severely disabled. . . . It is unlikely that Mr. Fura will regain strength and sensation in his lower extremities. His sensorimotor demyelinating polyneuropathy will continue to progress. Mr. Fura, because of his other medical problems, is not a candidate for further surgeries on his back.

AR 00044-45.

23. Dr. Ganley conducted electromyography ("EMG") testing on Fura's lower extremities on August 18, 2009. She concluded that "[t]his is a markedly abnormal electromyogram. There is evidence of acute denervation in all muscles tested. The nerves are markedly abnormal with absence of responses. These findings have worsened since the patient's previous EMG dated February 8, 2008. . . . There are definite signs of progression of the patient's bilateral L5 radiculopathy as well as peripheral polyneuropathy." AR 00047.

24. Dr. Ganley also ordered a "somatosensory evoked potentials" test of Fura's lower extremities on September 17, 2009. This test found "abnormal lower extremity somatosensory evoked responses. . . . These findings are indicative of a conduction delay in the large fiber sensory pathways from lumbar point to the cortex on each side. In addition, Mr. Fura could have bilateral peripheral neuropathy." AR 00046.

25. On October 12, 2009, Fura underwent a lumbar myelogram with post myelogram CT of the lumbar spine. The conclusion was that "severe degenerative changes are shown in the lumbar spine." AR 00052-54.

26. Following the CT scan, Fura was seen in Dr. Easton's office. An examination of his spine/pelvis area was described as follows: "Generalized tenderness in the lumbar area, generalized crepitation in the lumbar area. . . . no [curvature of the spine]. Movement restricted in all directions secondary to fusion, movement restricted in all directions secondary to pain.

Stability in question.  Abdominal muscle atrophy present.  No spinal spasms." AR 00042 (10/19/09 visit).  Dr. Easton noted muscle weakness and atrophy in Fura's legs and that he had an "antalgic" gait, which he later described was "widened with braces." AR 00043 (12/14/09 addendum).  Although Fura's reflexes were initially described as "normal," in an addendum Dr. Easton noted that reflexes were "absent bilateral achilles and patellar bilaterally." Id.

27.     Dr. Ganley provided an affidavit on Fura's behalf on November 11, 2009.  AR 00032-33.  In it, Dr. Ganley noted the various recent studies done on Mr. Fura – the August 18, 2009 EMG, the September 17, 2009 somatosensory evoked potentials study, and the October 12, 2009 CT spine post myelogram and lumbar myelogram.  She concluded that "[b]ased on the clinical data described above, along with my own observations of Mr. Fura during several visits, it is my opinion that Mr. Fura's neurological deficits are so severe that he is incapable of working in any capacity.  Mr. Fura's neurological deficits severely impair his ability to ambulate, sit, stand and drive.  To that end, Mr. Fura requires a walker to ambulate.  Furthermore, given Mr. Fura's severe radiculopathy and peripheral neuropathy, standing or sitting causes Mr. Fura to experience numbness and pain." AR 00032-33.

28.     On December 18, 2009, Fura's attorney sent an appeal letter to Aetna.

29.     Aetna sought additional reviews of Fura's file by Dr. Vaughn Cohan (neurologist) and Dr. Lawrence Blumberg (orthopedic surgeon).  On January 5, 2010, Dr. Cohan noted that Dr. Ganley's findings ("absence of sensation distally in the lower in the lower extremities," "requires the use of a walker for ambulation," and "difficulty arising from a chair") "are inconsistent with those described by Drs. Easton and Kalkanis." AR 00304.

30.     Dr. Cohan noted that the "medical records do reflect that the claimant has clinical and

electrodiagnostic evidence of radiculopathy and neuropathy. However, it is my opinion that the documentation is not indicative of a functional impairment of sufficient severity and/or intensity as to preclude the claimant from engaging in any compensable employment for a minimum of 25 hours per week. . . . There is no evidence of any impairment with respect to upper extremity functioning. . . . There is no evidence that the claimant's pain is of sufficient severity and/or intensity as to preclude work. There is no indication that the claimant is unable to endure the seated and/or standing posture for a period of time which would allow for performance of sedentary work, particularly if given an opportunity to change positions as needed during the course of the work day." AR 00305.

31.     In his January 11, 2010 file review, Dr. Blumberg opined that "[b]ased on clinical documentation, the records do not demonstrate a functional impairment that would preclude the claimant from engaging in any compensable employment for a minimum of 25 hours per week. There is no evidence that he cannot stand, sit, or ambulate. There is no evidence he cannot use his upper extremities for a variety of activities. He is therefore capable of any occupational activities for a minimum of 25 hours per week." AR 00310-313.

32.     On February 24, 2010, Aetna denied Fura's appeal, noting that the Aetna Review Committee "determined there are no significant objective findings to substantiate that a functional impairment exists that would preclude work in any compensable employment for twenty-five hours per week." AR 00004-5.

33.     Subsequently, Fura filed this action to recover long-term disability benefits under the Plan.

## **CONCLUSIONS OF LAW**

1.      The court has jurisdiction pursuant to 29 U.S.C. § 1132(e).

2.      In an ERISA denial of benefits case, judicial review is *de novo* "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989); see also Glenn v. MetLife, 461 F.3d 660, 665-66 (6th Cir. 2006).

3.      If the plan grants discretion to the administrator or fiduciary, the district court is required to review the denial of benefits under an "arbitrary and capricious" standard. See Glenn, 461 F.3d at 666.

4.      In this case, the "arbitrary and capricious" standard applies, because the Plan grants discretion to the administrator.

5.      "Although that standard is deferential, it is not a rubber stamp for the administrator's determination." Elliott v. Metropolitan Life Ins. Co., 473 F.3d 613, 617 (6th Cir. 2006). The court will uphold the administrator's decision "if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." Id. (citation omitted). The court must "review the quality and quantity of the medical evidence and the opinions on both sides of the issues." Cooper v. Life Ins. Co. of North America, 486 F.3d 157, 165 (6th Cir. 2007).

6.      Fura challenges Aetna's denial of benefits as arbitrary and capricious because he alleges that Aetna ignored the opinions of his treating physicians, did not adequately explain why it reached a conclusion contrary to that reached by the Social Security Administration, and relied upon file reviews to deny his claim.[1]

---

[1] Fura also contends that an inherent conflict of interest exists, alleging that the plan administrator both evaluates claims for benefits and pays those claims. See generally Metropolitan Life v. Glenn, 554 U.S. 105 (2008) ("Where the entity that administers an ERISA

7.      In response to the first challenge, Aetna notes that it is not required to give special weight to the opinions of Fura's treating physicians.  Indeed, "courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician." Black & Decker Disability Plan v. Nord, 538 U.S. 822, 834 (2003).  However, "[p]lan administrators, of course, may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." Id.

8.      Further, "when a plan administrator favors a conclusory independent medical consultant report over the findings of a claimant's treating physician, that decision may properly be considered arbitrary." Blajei v. Sedgwick Claims Mgmt. Serv., Inc., 721 F. Supp.2d 584, 602 (E.D. Mich. 2010) (citing Kalish v. Liberty Mut./Liberty Life Assur. Co. of Boston, 419 F.3d 501, 509-10 (6th Cir. 2005); Calvert v. Firstar Finance, Inc., 409 F.3d 286, 296-97 (6th Cir. 2005)).

9.      In this case, all three of Fura's treating physicians opined that he was not capable of working in any job for a minimum of twenty-five hours per week.  More specifically, Dr. Ganley stated in an affidavit that "*[b]ased on the clinical data* . . . along with my own observations of Mr. Fura during several visits, it is my opinion that Mr. Fura's neurological deficits are so severe that he is incapable of working in any capacity.  Mr. Fura's neurological deficits severely impair

---

plan, such as an employer or an insurance company, both determines whether an employee is eligible for benefits and pays benefits out of its own pocket, a conflict of interest is created, and a reviewing court should consider that conflict as a factor in determining whether the plan administrator has abused its discretion in denying benefits. . . .").  However, there is no evidence that a conflict of interest exists here.  Federal Express funds the plan, but Aetna determines which claims are paid.  See Register v. Aetna Life Ins. Co., 2010 U.S. Dist. LEXIS 16160 (M.D. Fla. Jan. 7, 2010).

his ability to ambulate, sit, stand and drive.  To that end, Mr. Fura requires a walker to ambulate. Furthermore, given Mr. Fura's severe radiculopathy and peripheral neuropathy, standing or sitting causes Mr. Fura to experience numbness and pain." AR 00032-33 (emphasis added).

10.    Aetna's peer reviewers, Drs. Blumberg and Cohan, did not directly rebut Dr. Ganley's conclusions, other than to state in a conclusory manner that the records did not reflect an impairment that would prevent Fura from working twenty-five hours per week.  Dr. Cohan noted that Dr. Ganley's findings ("absence of sensation distally in the lower in the lower extremities," "requires the use of a walker for ambulation," and "difficulty arising from a chair") "are inconsistent with those described by Drs. Easton and Kalkanis." AR 00304.  Dr. Cohan apparently chose to ignore Dr. Ganley's findings, which would be favorable to Fura's benefit determination.  The court finds no rational basis for doing so, particularly in the absence of a physical examination or specific reasoning explaining why Dr. Ganley's opinion should be disregarded.  See Calvert, 409 F.3d at 295 (finding that "the failure to conduct a physical examination – especially where the right to do so is specifically reserved in the plan – may, in some cases, raise questions about the thoroughness and accuracy of the benefits determination"); Kalish, 419 F.3d at 510 (finding file review inadequate because the "report also fails to rebut the contrary medical conclusions reached by . . . the physician who conducted regular physical examinations of [the claimant]"); Cooper, 486 F.3d at 170 (insurer unreasonably relied upon report that "summarized those parts of the file favorable to [the insurer], omitted the parts that tended to support [the] claim, and concluded that there was insufficient evidence of disability"); Blajei, 721 F. Supp.2d 584, 604 (finding review inadequate where reviewer "cherry-picked" favorable portions and omitted unfavorable portions of medical records).

11.     Neither of the reviewing doctors explained why the clinical data was insufficient to support Dr. Ganley's conclusions that Fura's ability to sit, stand, and drive was severely impaired. Nor did they explain how someone with Fura's impairments would be able to work in any position an average of five hours per day. Although both Dr. Cohan and Dr. Blumberg noted that Fura is able to use his upper extremities, the court is puzzled as to how this negates a finding of total disability given Fura's "severe" impairment with respect to his ability to sit, stand, or drive. Aetna's reliance of these inadequate paper reviews was arbitrary and capricious.

12.     This is underscored by Aetna's failure to explain why it came to a different conclusion on the issue of total disability than the Social Security Administration; Aetna merely stated that the standard under the Social Security Act is different than the standard under the Plan.[2] See Calvert, 409 F.3d at 294 (finding that although SSA determination is not dispositive, it is "one factor the Court should consider, in the context of the record as a whole, in determining whether . . . [the] contrary decision was arbitrary and capricious"); Bennett v. Kemper Nat'l Servs., 514 F.3d 547, 554 (6th Cir. 2008).

13.     For all of these reasons, the court finds that Aetna's decision to deny Fura disability benefits under the Plan was arbitrary and capricious.

14.     As a remedy, the court "may either award benefits to the claimant or remand to the plan administrator." Elliott v. Metropolitan Life Ins. Co., 473 F.3d 613, 621 (6th Cir. 2006). "[W]here

---

[2] Aetna argues that Fura did not provide a copy of the SSA determination, but that the decision was only reported to Aetna by Fura's counsel. In the final denial letter, however, Aetna did not dispute that Fura was awarded Social Security Disability benefits, nor did it suggest that it lacked sufficient information regarding the SSA determination. Rather, it stated only that "the criteria utilized by the Social Security Administration for the determination of Social Security disability awards are different from the definition for Total Disability set forth in the Plan. . . ." AR 00002.

the problem is with the integrity of [the plan's] decision-making process, rather than that [a claimant] was denied benefits to which he was clearly entitled, the appropriate remedy generally is remand to the plan administrator." Id. (internal quotation marks omitted).

15. In this case, the objective medical evidence supports the opinions of Fura's treating physicians that he is unable to work in any position for twenty-five hours per week. The contrary opinions of Aetna's reviewing physicians "are not entitled to countervailing weight" for the reasons stated above. See Cooper, 486 F.3d at 172. The court finds that, on this record, Fura is clearly entitled to benefits. Therefore, the court will not remand to the plan administrator. As the Sixth Circuit noted: "Plan administrators should not be given two bites at the proverbial apple where the claimant is clearly entitled to disability benefits. They need to properly and fairly evaluate the claim the first time around; otherwise they take the risk of not getting a second chance, except in cases where the adequacy of claimant's proof is reasonably debatable. That is not the case here." Id.

16. Accordingly, the court will enter judgment in favor of Fura awarding long-term disability benefits effective August 9, 2009. Plaintiff shall submit a proposed judgment within ten days of the date of this order.

                                                  s/John Corbett O'Meara
                                                  United States District Judge

Date: November 17, 2011

     I hereby certify that a copy of the foregoing document was served upon counsel of record on this date, November 17, 2011, using the ECF system.

                                                  s/William Barkholz
                                                  Case Manager